Leda Dunn Wettre, Esq.
Michael J. Gesualdo, Esq.
ROBINSON, WETTRE & MILLER LLC
One Newark Center, 19th Floor
Newark, New Jersey  07102
Telephone:  (973) 690-5400
Facsimile:  (973) 466-2760
lwettre@rwmlegal.com

OF COUNSEL:
William G. Gaede III, Esq. (*pro hac vice*)
David L. Larson, Esq. (*pro hac vice*)
Bhanu K. Sadasivan, Esq. (*pro hac vice*)
Shane G. Smith, Esq. (*pro hac vice*)
Daniel K. Greene, Esq. (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025-4004
Telephone:  +1 650 815 7400

*Attorneys for Plaintiff Depomed, Inc.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEPOMED, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACTAVIS ELIZABETH LLC et al., <br><br> Defendant. | No: 3:12-CV-01358 JAP (TJB) <br><br> **MEMORANDUM OF LAW IN SUPPORT OF DEPOMED INC.'S MOTION IN LIMINE NOS. 3 – 5 TO EXCLUDE EXPERT TESTIMONY THAT DOES NOT COMPLY WITH *DAUBERT*** <br><br><br> **Honorable Joel A. Pisano** |

*REDACTED PUBLIC VERSION*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................1

II. LEGAL STANDARDS ...................................................................1

    A. Legal Framework For Admitting Expert Testimony ...........................1

    B. Scientific Evidence Must Satisfy Daubert Before it is Admitted in a Bench Trial ....................................................................3

III. MOTION NO. 3 TO STRIKE FROM DR. FRIEND'S EXPERT REPORT OPINIONS APPLYING THE INCORRECT CLAIM CONSTRUCTIONS AND TO EXCLUDE TESTIMONY THEREOF ........4

    A. The Court Should Strike Dr. Friend's Opinions as to "Oval" and Exclude Testimony Thereof Because Dr. Friend Failed to Apply the Construction of the "Oval" Element for Claim 1 of the '962 Patent ....................................................................5

    B. The Court Should Strike Dr. Friend's Opinions as to "Size Exceeding the Pyloric Diameter…" and Exclude Testimony Thereof Because Dr. Friend Failed To Apply the Court's Construction of the Claim Element Found in Claim 1 of the '280 Patent ....................................................................6

    C. The Court Should Strike Dr. Friend's Opinions as to "Within About" 10 hours or " of about 5-12 Hours" Found in Asserted Claim 45 of the '280 Patent and Asserted Claim 26 of the '927 Patent Respectively and Exclude Testimony Thereof Because Dr. Friend Failed to Apply "About" and Limited the Claims to Strictly "Within" 10 or 12 hours ....................................................................8

    D. The Court Should Strike Dr. Friend's Opinions as to "Releases Substantially All of the Drug after such Immersion" Which Appears in Claim 1 of the '280 Patent Because He Read in an 8 hour Requirement From Dependent Claim 46 and/or Applied the Construction From the '475 Patent No Longer at Issue in this Litigation ....................................................................10

**TABLE OF CONTENTS**
(continued)

Page

IV.   MOTION NO. 4: THE COURT SHOULD STRIKE DR. PARK'S
REBUTTAL EXPERT OPINION AND EXCLUDE TESTIMONY
THEREOF PERTAINING TO ████████████ ON ALLEGED
EROSION OF THE POLYMER MATRIX .................................................11

V.   MOTION NO. 5: THE COURT SHOULD STRIKE THE
REBUTTAL REPORT OF DR. SINATRA AND EXCLUDE
TESTIMONY THEREOF .........................................................................13

A.   Dr. Sinatra's Long Felt Need Opinion Is Inadmissible .....................14

1.   Dr. Sinatra Did Not Employ the Intellectual Rigor that
Characterizes the Practice in His Field ....................................14

a.   Dr. Sinatra Does Not Cite To Any Reliable,
Objective Sources .........................................................16

b.   Dr. Sinatra Formed His Firm Conclusion Before
Doing Sufficient Research to Do So .............................21

2.   Dr. Sinatra's Opinion Does Not Fit the Facts of this Case ......25

3.   Dr. Sinatra's Testimony Should Be Excluded Because It
Will Waste The Court's Time ...................................................26

B.   Dr. Sinatra's Opinions That Drugs Not Available In 2001
Satisfied A Long Felt Need Do Not Fit the Facts of the Case ...........26

VI.   CONCLUSION..........................................................................................28

## TABLE OF AUTHORITIES

Page

**CASES**

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*
713 F.3d 1090 (Fed. Cir. 2013) ............................................................11

*Cephalon, Inc. v. Watson Pharms., Inc.*
707 F.3d 1330 (Fed. Cir. 2013) ..............................................................9

*Chase Manhattan Mortgage Corp. v. Advanta Corp.*
C.A. No. 01-507, 2004 WL 422681 (D. Del. March 4, 2004) ..............................4

*Claar v. Burlington N. R.R. Co.*
29 F.3d 499 (9th Cir. 1994) .................................................... 21, 22, 25

*Daubert v. Merrell Dow Pharms., Inc.*
43 F.3d 1311 (9th Cir. 1995) ............................................. 2, 15, 21, 25

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993) ...................................................................... passim

*Davis v. Duran*
277 F.R.D. 362 (N.D. Ill. 2011) ..........................................................25

*Depomed v. Lupin*
Case No. C-09-5587, 2011 U.S. Dist. LEXIS 52839 (N.D. Cal. May 17, 2011) ..5

*Depomed v. Sun*
Case No. 3:11-CV-03553 JAP (TJB) (D.N.J.) ......................................................5

*Gannon v. U.S.*
571 F.Supp.2d 615 (E.D. Pa. 2007).......................................................4

*General Elec. Co. v. Joiner*
522 U.S. 136 (1997) ........................................................ 1, 2, 21, 25

*In re Paoli R.R. Yard PCB Litig.*
35 F.3d 717 (3d Cir. 1994) ............................................................ passim

*In re Salem*
465 F.3d 767 (7th Cir. 2006) ...............................................................3

*In re Unisys Savings Plan Litig.*
173 F.3d 145 (3d Cir. 1999) ............................................................ 2, 26

**TABLE OF AUTHORITIES**
(continued)

Page

*Jacobellis v. Ohio*
378 U.S. 184 (1964) ......................................................................................18

*Kumho Tire Co. v. Carmichael*
526 U.S. 137 (1999) .......................................................................... 14, 15, 24

*Ortho-McNeil Pharm. v. Caraco Pharm. Labs., Ltd.*
476 F.3d 1321 (Fed. Cir. 2007) .....................................................................8

*Procter & Gamble Co. v. Teva Pharms.*
566 F.3d 989 (Fed. Cir. 2009) ......................................................................27

*Schneider ex. rel. Estate of Schneider v. Fried*
320 F.3d 396 (3rd Cir. 2003)................................................................. passim

*Seaboard Lumber Co. v. U.S.*
308 F.3d 1283 (Fed. Cir. 2002) .....................................................................3

*Sheehan v. Daily Racing Form, Inc.*
104 F.3d 940 (7th Cir. 1997) ................................................................ 14, 15, 24

*Trojecki v. U.S.*
C.A. No. 11-5379, 2013 WL 797943 (E.D. Pa. March 5, 2013) ......................3, 4

*U.S. v. Downing*
753 F.2d 1224 (3d Cir. 1985) ......................................................................15

**RULES**

Fed. R. Evid. 104(a) .......................................................................................3

Fed. R. Evid. 401 .................................................................................. passim

Fed. R. Evid. 403 .................................................................................. passim

Fed. R. Evid. 702 .................................................................................. passim

Fed. R. Evid. 703 ........................................................................................15

## I.      INTRODUCTION

The Federal Rules of Evidence provide that the Court may admit expert opinions and testimony only if they comply with the prerequisites set forth in these rules, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and cases applying *Daubert*.  For the reasons set forth below, the Court should grant Motion *In Limine* Nos. 3 through 5 filed by Depomed, Inc. ("Depomed") and strike several opinions of Defendants Actavis Elizabeth LLC's and Actavis LLC's (collectively, "Actavis") experts and exclude any expert testimony thereof.

## II.      LEGAL STANDARDS

### A.      LEGAL FRAMEWORK FOR ADMITTING EXPERT TESTIMONY

The party proffering the expert testimony bears the burden to demonstrate by a preponderance of the evidence that the expert's testimony satisfies the admissibility perquisites of *Daubert* and Rule 702. *Daubert*, 509 U.S. 579; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). The focus of the admissibility inquiry is on the methods, not the conclusions, though conclusions can inform the Court's analysis of the unreliability of the methods employed. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In this Circuit, the *Daubert* and Rule 702 prerequisites are referred to as the "qualification, reliability, and fit" requirement. *See Schneider ex. rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3rd Cir. 2003) (citations omitted).  The proffered testimony must satisfy each of these elements to be admissible. An

expert's opinions satisfy the **qualification** element only if the expert "possesses specialized expertise." *Schneider*, 320 F.3d at 404.  The opinion testimony must also be **reliable** by being based on "good grounds," *i.e.*, it must be based on the "methods and procedures of science rather than on subjective belief or unsupported speculation." *Id.*  An expert's *ipse dixit* by itself is insufficient to satisfy the reliability element. *Joiner*, 522 U.S. at 146; *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*").  Finally, the proffered testimony must "**fit** the issues of the case" such that the testimony "must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. Put another way, there must be a "valid scientific connection to the pertinent inquiry as a precondition for admissibility." *Id.*

In addition, where the proffered expert testimony will waste the Court's time, Federal Rule of Evidence 403 ("Rule 403") also supports exclusion. *See Paoli*, 35 F.3d at 746 (noting that analysis under Rule 702 partly incorporates Rule 403, but Rule 403 can be used to exclude evidence that is a waste of the court's time); *In re Unisys Savings Plan Litig.*, 173 F.3d 145 (3d Cir. 1999) (court properly excluded expert testimony for waste of time where the Court decided already that the expert was not credible).

## B.   SCIENTIFIC EVIDENCE MUST SATISFY DAUBERT BEFORE IT IS ADMITTED IN A BENCH TRIAL

Even though this trial will be a bench trial, Actavis must still establish that its experts' opinions meet the prerequisites of admissibility of expert testimony. *E.g.*, *Seaboard Lumber Co. v. U.S.*, 308 F.3d 1283, 1302 (Fed. Cir. 2002). Whereas "the Third Circuit has given no indication as to how and if *Daubert* hearings differ for bench trials," *Trojecki v. U.S.*, C.A. No. 11-5379, 2013 WL 797943, at *2 (E.D. Pa. March 5, 2013), courts in other circuits have stated that the need to conduct a *Daubert* hearing before trial is "lessened" in a bench trial compared to a jury trial, but the need is not eliminated altogether. *E.g.*, *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

The only question for the Court is when it should perform the *Daubert* analysis. A court should do so before trial where "there is a serious question of reliability [and admissibility] of evidence" and on considerations of economy. *See Paoli*, 35 F.3d at 743 (instructing courts to exercise their screening function when there is a serious question of reliability and admissibility of evidence); *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified…or evidence is admissible."). When considering objections to expert testimony that may go to the weight rather than admissibility, courts frequently consider *Daubert* challenges after first hearing the testimony before determining what, if any, weight to give the testimony. *See, e.g., Trojecki*,

2013 WL 797943 at *2; *Gannon v. U.S.*, 571 F.Supp.2d 615, 616-17 (E.D. Pa. 2007).

Principles of economy favor pre-trial *Daubert* hearing for evidence that may be inadmissible. *Cf. Trojecki*, 2013 WL 797943 at *2; *Gannon*, 571 F.Supp.2d at 616-17. For example, in *Chase Manhattan Mortgage Corp. v. Advanta Corp.*, the court declined to exclude expert testimony before trial because the evidence was not clearly inadmissible, but the court did acknowledge the parties' contention that pre-trial *Daubert* rulings would streamline trial because the attorneys would not need to prepare to examine witnesses whose testimony was inadmissible. C.A. No. 01-507, 2004 WL 422681, at *10 (D. Del. March 4, 2004).

## III.   MOTION NO. 3 TO STRIKE FROM DR. FRIEND'S EXPERT REPORT OPINIONS APPLYING THE INCORRECT CLAIM CONSTRUCTIONS AND TO EXCLUDE TESTIMONY THEREOF

Logic dictates that if an expert's opinions are based on claim constructions other than the constructions ordered by the Court, then those opinions do not "fit" the facts of the case and therefore should be stricken and excluded for being unhelpful to the trier of fact. *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 702. In addition, opinions based on incorrect claim constructions are irrelevant under the general standard (Fed. R. Evid. 401), and presentation thereof will waste the Court's time (Rule 403).

**A.  THE COURT SHOULD STRIKE DR. FRIEND'S OPINIONS AS TO "OVAL" AND EXCLUDE TESTIMONY THEREOF BECAUSE DR. FRIEND FAILED TO APPLY THE CONSTRUCTION OF THE "OVAL" ELEMENT FOR CLAIM 1 OF THE '962 PATENT**

During the claim construction process, the parties agreed that "oval" means "any curve that is closed and concave towards the center wherein the geometric form bounded by the closed curve has a first and second orthogonal axes of unequal length."[1] (ECF No. 188-1 at A-3.)  This was the construction Judge Hamilton rendered in *Depomed v. Lupin*, Case No. C 09-5587, 2011 U.S. Dist. LEXIS 52839 (N.D. Cal. May 17, 2011) and this Court ordered in *Depomed v. Sun*, Case 3:11-cv-03553-JAP-TJB.  In his rebuttal expert report concerning non-infringement of this claim term, Dr. Friend did not apply the parties' agreed construction, (Ex. 5[2] ¶¶ 32, 75-81), a fact he admitted during his deposition.  (Ex. 6 at 166:15-169:3.)  Instead, he looked to a pharmaceutical manufacturer's manual and applied a picture of an oval depicted therein.  Accordingly, Dr. Friend's

---

[1]  This term appears in claim 1 of the '962 Patent (emphasis added): "A controlled-release oral drug dosage form for releasing a drug into at least a portion of a region defined by the stomach and the upper gastrointestinal tract, said dosage form comprising a solid monolithic matrix with said drug contained therein, said matrix being non-circular in shape and having first and second orthogonal axes of unequal length, said matrix being one that swells in an unrestricted manner along both such axes upon imbibition of water, the longer such axis having a maximum length of 3.0 cm when said matrix is unswollen, and the shorter such axis achieving a minimum length of 1.2 cm within one hour of immersion of said dosage form in water and wherein said matrix has a shape which when projected onto a plane, *is either an oval or a parallelogram.*"

[2]  Citations to "Ex. _" are to the Declaration of Daniel K. Greene in Support of Depomed Inc.'s Motion *In Limine* Nos. 1-6, filed concurrently herewith.

opinions as to "oval" do not fit the facts of the case, and the Court should strike this opinion and exclude any expert testimony thereof, including testimony of Actavis experts who relied on this incorrect analysis. *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 702, 403, 401.

**B.    THE COURT SHOULD STRIKE DR. FRIEND'S OPINIONS AS TO "SIZE EXCEEDING THE PYLORIC DIAMETER…" AND EXCLUDE TESTIMONY THEREOF BECAUSE DR. FRIEND FAILED TO APPLY THE COURT'S CONSTRUCTION OF THE CLAIM ELEMENT FOUND IN CLAIM 1 OF THE '280 PATENT**

The Court construed the following element of asserted claim 1 of '280 Patent "[the dosage form] is of a size exceeding the pyloric diameter in the fed mode to promote retention in the stomach during said fed mode" to mean "such that when the dosage form is introduced into the stomach in the fed mode, the dosage form remains in the stomach for several hours." [3] (*E.g.*, Ex. 5 at ¶¶ 33, 42; Ex. 6 at 99:22-101:17.)  Dr. Friend's infringement analysis reads in an additional

---

[3]    Claim 1 of the '280 Patent recites in its entirety (emphasis added):   "A controlled-release oral drug dosage form for releasing a drug whose solubility in water is greater than one part by weight of said drug in ten parts by weight of water, said dosage form comprising one or more polymers forming a solid polymeric matrix with said drug incorporated therein at a weight ratio of drug to polymer of from 15:85 to 80:20, said dosage form being one that when swollen in a dimensionally unrestricted manner as a result of imbibition of water is of *a size exceeding the pyloric diameter in the fed mode to promote retention in the stomach during said fed mode*, that releases said drug into gastric fluid by the dissolution and diffusion of said drug out of said matrix by said gastric fluid, that upon immersion in gastric fluid retains at least about 40% of said drug one hour after such immersion and releases substantially all of said drug after such immersion, and that remains substantially intact until substantially all of said drug is released."

requirement that the dimensions of the dosage form "must be of a size that is larger than the pyloric diameter in the fed mode." (Ex. 5 at ¶ 42.) As reflected in this Court's *Markman* Order, this additional limitation resurrects Defendants' rejected construction that the dosage form "*is of a size exceeding the pyloric diameter in the fed mode* such that when introduced into the stomach in the fed mode, the dosage form remains in the stomach for the duration of drug delivery." (ECF No. 251 at 7-8.)

Despite that nothing in the construction provided by the Court requires measurements of size, and despite that Dr. Friend recognized that the Court declined to construe this term to include in its construction limitations as to size as advocated by Defendants, Dr. Friend nevertheless opined that Actavis does not infringe based on the measurements of the accused Actavis dosage form as compared to the mean of the resting pylorus in a human. (*E.g.*, Ex. 5 at ¶¶ 41-66; Ex. 6 at 99:22-105:7.) Dr. Friend admitted during his deposition that his non-infringement analysis is not based on the Court's construction. (Ex. 6 at 104:9-20.) Accordingly, Dr. Friend's opinion as to "size exceeding the pyloric diameter" does not fit the facts of the case, and the Court should strike this opinion and exclude any expert testimony thereof, including testimony of any Actavis expert who relied on this incorrect analysis. *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 702, 403, 401.

**C. THE COURT SHOULD STRIKE DR. FRIEND'S OPINIONS AS TO "WITHIN ABOUT" 10 HOURS OR " OF ABOUT 5-12 HOURS" FOUND IN ASSERTED CLAIM 45 OF THE '280 PATENT AND ASSERTED CLAIM 26 OF THE '927 PATENT RESPECTIVELY AND EXCLUDE TESTIMONY THEREOF BECAUSE DR. FRIEND FAILED TO APPLY "ABOUT" AND LIMITED THE CLAIMS TO STRICTLY "WITHIN" 10 OR 12 HOURS**

Dr. Friend recognized that the Court held that the following term (relevant portion italicized) did not require construction and should therefore be interpreted according to its plain and ordinary meaning: "gabapentin is released from the matrix into the upper gastrointestinal tract *over about 5-12 hours* at a rate sufficient to achieve a longer time to the maximum plasma concentration than that provided by an immediate release dosage form comprising an equal amount of gabapentin." (Ex. 5 at 9-10 (Term Nos. 43, 47).) Asserted claim 45 of the '280 Patent also recites "about": in its entirety, claim 45 recites (emphasis added), "A dosage form in accordance with claim 1 in which said dosage form releases substantially all of said drug *within about ten hours after immersion in gastric fluid.*"

 Dr. Friend ignored the "about" in this claim language and opined for noninfringement based on a theory that Actavis's accused product did not have properties that fit within the exact numerical ranges recited. The problem with this testimony is that has long been held that the term "'about' avoids a strict numerical boundary to the specified parameter." *See Ortho-McNeil Pharm. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326-27 (Fed. Cir. 2007) (collecting cases). Non-

infringement analysis is reliable only if the analysis considers all the words of the claim. *E.g.*, *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013) (stating standard). Accordingly, admissible non-infringement analysis must account for "about."

Dr. Friend's non-infringement analysis admittedly did not. During his deposition Dr. Friend acknowledged that "about" provides some flexibility from the exact numerical ranges recited; the term "within about 10 hours" or "about over 5-12 hours" does not mean that the Actavis accused product infringes if only within 10 hours, exactly, or between 5-12 hours, exactly. (*E.g.*, Ex. 6 at 132:23-135:11.) ██████████████████████████████████████

██████████████████████████████████████████ (*E.g.*, Ex. 5 at ¶¶ 60-66 and ¶¶ 98-101.)   As such, Dr. Friend's opinion as to "within about 10 hours" or "about over 5-12 hours" does not fit the facts and the plain claim language of the case, and the Court should strike this opinion and exclude any expert testimony thereof, including testimony by any Actavis expert who relied on this incorrect analysis. *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 702, 403, 401.

**D.     THE COURT SHOULD STRIKE DR. FRIEND'S OPINIONS AS TO "RELEASES SUBSTANTIALLY ALL OF THE DRUG AFTER SUCH IMMERSION" WHICH APPEARS IN CLAIM 1 OF THE '280 PATENT BECAUSE HE READ IN AN 8 HOUR REQUIREMENT FROM DEPENDENT CLAIM 46 AND/OR APPLIED THE CONSTRUCTION FROM THE '475 PATENT NO LONGER AT ISSUE IN THIS LITIGATION**

Dr. Friend also fails to apply the correct construction for the term "releases substantially all of the drug after such immersion" which appears in claim 1 of the '280 Patent. Specifically, Dr. Friend reads into this term a limitation that substantial release must occur within eight hours: "at least 80% of the drug has been released after eight hours of immersion in gastric fluid." (Ex. 5 at 8 (term no. 61), ¶ 60; Ex. 6 at 127:10-130:25.)

The problem is that Dr. Friend applied to claim 1 of the '280 Patent (which recites no time limitation) a construction for a different term from a different claim, namely claim 1 of the '475 Patent (no longer at issue) that does recite a time limitation of eight hours. Number 61 from the list of agreed terms confirms that the construction Dr. Friend is incorrect, for the alleged agreed construction contains the improper time limitation:

| No. | Claim Term | Agreed Construction |
|-----|------------|---------------------|
| 60 | gastric fluid | both the fluid in the stomach and simulated or artificial fluids recognized by those skill[ed] in the art as a suitable model for the fluid of the human stomach |
| 61 | releases substantially all of said drug without about eight hours after such immersion | at least 80% of the drug has been released after eight hours of immersion in gastric fluid |

(ECF No. 118-1 at A-3.) By contrast, Claim 1 of the '280 Patent which Dr. Friend purports to analyze recites no time limitation: "and releases substantially all of said drug after such immersion."[4] During his deposition, Dr. Friend acknowledged the difference and indicated that his misapplication of the incorrect claim construction could change his opinion. (Ex. 6 at 123:24-130:25.)

Accordingly, Dr. Friend's opinion as to "at least 80% of the drug has been released after eight hours of immersion in gastric fluid" does not fit the facts and claim language as to claim 1 of the '280 Patent, and the Court should strike this opinion and exclude any expert testimony thereof (including testimony of any other experts who relied on this incorrect analysis). *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 702, 403, 401.

## IV.   MOTION NO. 4: THE COURT SHOULD STRIKE DR. PARK'S REBUTTAL EXPERT OPINION AND EXCLUDE TESTIMONY THEREOF PERTAINING TO ▆▆▆▆▆▆▆ ON ALLEGED EROSION OF THE POLYMER MATRIX

Dr. Park's rebuttal expert opinion (Ex. 13) – which does not respond to any Depomed expert reports - is being proffered to support Actavis's non-infringement

---

[4] Moreover, the doctrine of claim differentiation requires the parties to presume no eight hour limitation exists in independent claim 1 of the '280 patent, since claim 46, which depends from claim 1, recites an eight hour limitation: "A dosage form in accordance with claim 1 in which said dosage form releases substantially all of said drug *within about eight hours after immersion in gastric fluid*." *See, e.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013) (noting presumption of claim differentiation). Actavis has not argued that claim differentiation does not apply such that claim 1 of the '280 patent is limited to eight hours.

theory that Depomed cannot prove that Actavis's accused products polymer matrix remains "substantially intact" when substantially all (80%) of the drug is released from the matrix within the meaning of claim 1 of the '280 Patent. Dr. Park's report contains experimental data Dr. Park generated to test at ▆▆▆▆ the percent of polymer of the polymer matrix that comprises the dosage form was allegedly in solution. This data was not disclosed to Depomed until March 19, 2014, when Actavis served its rebuttal expert reports to Depomed's opening reports on infringement.

But the ▆▆▆▆ point is irrelevant. The claim requires assessment of whether the polymer matrix is "substantially intact" when "substantially all" (80%) of the drug is released from the polymer matrix.[5] Dr. Park's own report shows that for the Actavis 300 mg tablets, 80% of the drug is released ▆▆▆▆. (*E.g.*, Ex. 13 ¶ 11.) Likewise for the 600 mg Actavis tablets, Dr. Park's own data shows that

---

[5] Claim 1 of the '280 Patent recites in its entirety (emphasis added): "A controlled-release oral drug dosage form for releasing a drug whose solubility in water is greater than one part by weight of said drug in ten parts by weight of water, said dosage form comprising one or more polymers forming a solid polymeric matrix with said drug incorporated therein at a weight ratio of drug to polymer of from 15:85 to 80:20, said dosage form being one that when swollen in a dimensionally unrestricted manner as a result of imbibition of water is of a size exceeding the pyloric diameter in the fed mode to promote retention in the stomach during said fed mode, that releases said drug into gastric fluid by the dissolution and diffusion of said drug out of said matrix by said gastric fluid, that upon immersion in gastric fluid retains at least about 40% of said drug one hour after such immersion and releases substantially all of said drug after such immersion, ***and that remains substantially intact until substantially all of said drug is released.***"

the polymer matrix of the dosage form released 80% of the drug at ▇▇▇▇. (*E.g.*, *id.* ¶ 13.)  The data she generated of polymer erosion at ▇▇▇▇▇▇▇▇ later respectively.  Indeed, as the patent teaches, the matrix is ultimately expected to dissolve after releasing substantially all (80%) of the drug so that the dosage form is not gastrically retained well past the point at which the drug has been released.

The Court should strike portions of Dr. Park's rebuttal expert report describing the results of the alleged polymer erosion at the ▇▇▇▇ mark and exclude testimony thereof. Those studies have no bearing on infringement of any asserted claim because, by her own data, the time point for establishing whether the polymer matrix is "substantially intact" is ▇▇▇▇▇▇ *earlier*. As such, these studies do not fit the facts of the case, and taking testimony on them would waste the Court's time. *See Schneider*, 320 F.3d at 404; Fed. R. Evid. 403.

## V.    MOTION NO. 5: THE COURT SHOULD STRIKE THE REBUTTAL REPORT OF DR. SINATRA AND EXCLUDE TESTIMONY THEREOF

Dr. Sinatra's rebuttal expert report consists of two sections, neither of which meets the prerequisites to be admissible under *Daubert*. ***First***, Dr. Sinatra's opinion that there was no long-felt but unmet need for an extended release gabapentin as of 2001/2002, the earliest effective filing dates of the asserted claims, is unreliable and fails to meet the "fit" requirement of admissibility.

*Second*, Dr. Sinatra testifies that other drugs introduce after the earliest effective filing dates of the asserted claims met any alleged long-felt need, which also fails the "fit" requirement of admissibility.

### A.   DR. SINATRA'S LONG FELT NEED OPINION IS INADMISSIBLE

Dr. Sinatra's opinion that there is no long felt need for an extended release formulation of gabapentin is inadmissible because he did not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) ("[The expert must have been] as careful as he would be in his regular professional work outside his paid litigation consulting."). As such, Dr. Sinatra's opinion fails to meet either the "reliability" or "fit" requirements of admissibility.

### 1.   Dr. Sinatra Did Not Employ the Intellectual Rigor that Characterizes the Practice in His Field

Because Dr. Sinatra's opinions are scientific opinions, to be admitted they must be grounded in the scientific method that those in his field invariably apply in their non-litigation work. At minimum, testifying experts offering scientific opinions must cite to reliable "objective sources," such as a "learned treatise, the policy statement of a professional organization, [or] a published article in a reputable scientific journal," to ensure that they "have followed the scientific method as it is practiced by (at least) a recognized minority of scientists in the

field." *Daubert II*, 43 F.3d at 1319; *see also* Fed. R. Evid. 702(b), (c) (expert must reliably apply principles to sufficient facts or data).

In other words, a conclusion based on the scientific method must be supported by cited facts and data or other objective sources so that Depomed and the Court can test the veracity of that conclusion. Indeed, the principles of the scientific method and that an expert must employ the same level of rigor as in his non-litigation work are embodied in the factors the Court may consider when assessing the admissibility of Dr. Sinatra's testimony.[6] *E.g.*, *Kumho Tire*, 526 U.S. at 152; *Sheehan,* 104 F.3d at 942. And so just as a peer-reviewed scientific journal or a professional society would refuse to publish a paper concluding that there is no need for an extended release gabapentin where those conclusions are based only on unsupported contentions, the Court should refuse to admit expert testimony on the same topic where the testimony is beset by the same flaw. *See Kumho Tire*, 526 U.S. at 152; *Sheehan*, 104 F.3d at 942.

---

[6] Those factors include the provisions of Rules 702 and 703 as well as: whether a method consists of a testable hypothesis; whether the method has been subject to peer review; the known or potential rate of error; the existence of and maintenance of standards controlling the technique's operation; whether the method is generally accepted; the relationship of the technique to methods which have been established to be reliable; the qualifications of the expert witness testifying based on the methodology; and the non-judicial uses to which the method has been put. *Paoli*, 35 F.3d at 742 n.8 (*citing Daubert*, 509 U.S. at 592-96; *U.S. v. Downing*, 753 F.2d 1224, 1239 (3d Cir. 1985). For reasons of brevity, Depomed will not address each of these factors separately.

### a.    Dr. Sinatra Does Not Cite To Any Reliable, Objective Sources

Dr. Sinatra ignores these principles that guide his field and instead proffers an opinion that there was no long felt need on speculation and a reference to a single publication that, on its face, demonstrates that Dr. Sinatra's reliance thereon is unreliable. *See* Fed. R. Evid. 702(c) (testimony must be the "product of reliable principles and methods").

**Paragraphs 11-13 and 24.**    These paragraphs merely summarize Dr. Sinatra's opinions and incorporate the testimony (and flaws) contained in paragraphs 25 through 32. (Ex. 14 ¶¶ 11-13, 24.)

**Paragraphs 25 and 32.** Dr. Sinatra concludes that "noncompliance with Neurontin and/or generic gabapentin is not a significant issue." (*Id.* ¶¶ 25, 32.) Dr. Sinatra cites no source for this statement. Indeed, the only source he cites is Dr. Brown's report, and he does so only to disagree summarily with it.

**Paragraph 26.** Dr. Sinatra concludes that Dr. Brown "overstates the incidence of side effects from Neurontin" and thus patients often skip doses rather than deal with the side effects. But nowhere in that paragraph does Dr. Sinatra cite any support for the contrary proposition he advances, that "avoidance of dosing is of little medical relevance." (*Id.* ¶ 26.) Whereas Dr. Brown discussed her own patients' experiences with Neurontin and generic immediate release gabapentin as well as peer-reviewed research (*e.g.*, Ex. 15 ¶¶ 66-67, 80), in paragraph 26

Dr. Sinatra cites only Dr. Brown's report and does so only to disagree summarily with it.

**Paragraphs 27 and 28.** Dr. Sinatra again contends that Dr. Brown overstates the incidence of side effects of generic immediate release gabapentin. To support her conclusion, Dr. Brown relies on side effect data reported in the Neurontin and Gralise product inserts for cohorts taking either the placebo or the active ingredient. (*Id.* ¶¶ 81-82.) Dr. Brown analyzes these data and concludes that the incidences of dizziness and somnolence are much higher in the patients receiving Neurontin than in the patients receiving Gralise. (*Id.*)

In response, Dr. Sinatra criticizes Dr. Brown's reliance on the clinical study information. Dr. Sinatra contends that Dr. Brown's comparison of these two data sets is "scientifically unreliable" for failure to "determine the extent to which differences in side effects between Gralise and Neurontin are attributable to the[] group-to-group differences [between the two studies] or to difference between the drug products" as reflected in the side effect data on which Dr. Brown relies. (Ex. 14 ¶ 28.) According to Dr. Sinatra, these differences "suggest[] that there are significant differences between the group of  subjects that were studied in each of these studies." (*Id.* ¶ 27.)

But Dr. Sinatra only points out that there are differences; he does not point out any specific flaws or describe any analysis he had done that shows those

differences are significant, relevant, or even out of the ordinary in pain studies. Dr. Sinatra concludes that Dr. Brown's analysis is flawed simply because he says so, based on his own subjective "I-know-it-when-I-see-it" test.[7] In fact, during his deposition, Dr. Sinatra confirmed that he could have done several types of analyses to determine whether any differences in the study populations were relevant to Dr. Brown's analysis but chose not to:

> Q.    And so in paragraph 27 you don't do any analysis of the differences between the drug products as you say in the last sentence, do you?
>
> [Objection omitted]
>
> [A.]: I tried to keep this simple. I tried to look at efficacy data as well. I ***could have*** given you patient demographics. I ***could have*** given you dosing to show major differences that I talked about before. ***I just simply looked at the response in patients who are not getting any drug at all, and saying, how could it be a two to three-fold difference in adverse events in a population that is not receiving the drug if there weren't major differences or other variables inherent in that study?*** …

(Ex. 10 at 123:5-124:23 (emphases added).) Dr. Sinatra also testified that he did not do any statistical analysis to affirm his conclusion that group-to-group differences render Dr. Brown's conclusion unreliable. (*Id.* at 128:18-130:3.) Again,

---

[7] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of materials I understand to be embraced within [hardcore pornography], and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.").

Dr. Sinatra contends that there was no need for such analyses because the data do not pass his subjective eye test. (*Id.* at 151:6-13.)

**Paragraph 29.** Dr. Sinatra concludes that "[i]n any event, the side effects [of immediate release gabapentin], when compared to the [pain associated with post-herpetic neuropathy], were manageable." Dr. Sinatra cites a single paper to support this proposition. (Ex. 14 ¶ 29; Ex. 16.)

However, this paper is not reliable for this proposition he cites it for. In fact, even the authors believed that any conclusions about the effectiveness of gabapentin as a treatment for pain associated with post-herpetic neuralgia were speculative: "Whereas this retrospective study provides evidence of a beneficial effect of gabapentin on neuropathic chronic pain and demonstrates particular disease entities for which we have used it successfully, *definitive evidence needs to be obtained from double-blind placebo-controlled trials before a general acceptance of this treatment occurs*," and, therefore, "gabapentin *may* be an effective therapy for" pain associated with post-herpetic neuralgia. (Ex. 16 at GRALISE_JDG_00000140 (emphases added).)  The authors noted that the "primary weakness" of the paper was that there was no "predetermined control group." (*Id.*)

Dr. Sinatra provides no reason to draw from this paper – which was published in 1997 before gabapentin was approved for treatment of pain associated

with post herpetic neuralgia - the conclusion that those in the field believed that the side effects of immediate release gabapentin were "manageable" when compared to the pain of post herpetic neuropathy as of 2001/2002. Instead, he just states as much and asks the Court to accept that statement.

**Paragraphs 30 and 31.** Dr. Sinatra concludes that the continued sales of generic gabapentin immediate release formulation and Neurontin refute Dr. Brown's opinion that there is a long-felt need for an extended release formulation of gabapentin and that Gralise is "far more expensive than gabapentin, even in comparison to the brand Neurontin." Dr. Sinatra cites no evidence whatsoever as to the costs of Gralise vis-à-vis Neurontin and gabapentin, and during his deposition he could not recall where he found that information. (Ex. 10 at 106:14-23.)

Dr. Sinatra also contends in paragraph 31 that "Gralise fails to provide substantial advantages over the standard-of-care immediate release gabapentin." Here again, Dr. Sinatra cites no evidence to support this contention. In fact, Dr. Sinatra has ***never*** prescribed Gralise, and in connection with preparing his report, Dr. Sinatra ***did not speak to any physicians who have prescribed Gralise***. (Ex. 10 at 37:8-38:2, 70:6-19.) At best, Dr. Sinatra was "aware" of that extended release gabapentin was available. (*See id.* at 66:5-11.)

In sum, all of the testimony Dr. Sinatra provides to support his conclusion that there was no long-felt but unmet need is based on conclusory statements and a

lone, unreliable paper. In other words, the Court and Depomed have "been presented with only [Dr. Sinatra's] qualifications, [his] conclusions, and [his] assurances of reliability. Under *Daubert*, that is not enough." *See Daubert II*, 43 F.3d at 1319; *see also* Fed. R. Evid. 702(b), (c) (expert opinions must be based on sufficient facts or data to which reliable methods are applied); 702; *Joiner*, 522 U.S. at 146; *Schneider*, 320 F.3d at 404; *Paoli*, 35 F.3d at 745.

>   **b.    Dr. Sinatra Formed His Firm Conclusion Before Doing Sufficient Research to Do So**

In view of the principles of Rule 702, *Daubert*, and the scientific method, it is self-evident that a court should exclude expert testimony where the expert forms an opinion before doing the research sufficient to support it. The court in *Claar v. Burlington N. R.R. Co.* explained why opinions flawed in this way should be excluded:

> The district court also found that Drs. Hines and Nelson formed their opinions before reading the relevant literature, even though they admitted that they were not sufficiently familiar with the field to diagnose the causes of plaintiffs' injuries without first reviewing that literature. The district court correctly considered this finding, which sheds light on the experts' methods, in making its admissibility determination. … ***Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientist may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking objectivity that is the hallmark of the scientific method***.

29 F.3d 499, 502, 503 (9th Cir. 1994) (citation to *Daubert* omitted; emphasis added).

This reasoning is directly on point and supports excluding Dr. Sinatra's opinion that there was no long-felt but unmet need. ***First***, as noted above, Dr. Sinatra did not do any analysis to determine whether the differences between the groups participating in the Neurontin and Gralise clinical trials (on which Dr. Brown relied) were even relevant before concluding, per his I-know-it-when-I-see-it test, that reliance on those two data sets was unreasonable.  (*See* pp. 17-19, *supra*.)  Dr. Sinatra admitted that he "could have" done these analyses, but chose not to because he wanted to keep his report "simple." (Ex. 10 at 123:5-125:8.) In other words, he came to a "firm conclusion" that Dr. Brown's reliance on that data was unreasonable before doing any of the analysis that will support his conclusion. *See Claar*, 29 F.3d at 502-03.

***Second,*** Dr. Sinatra admitted that he did not do (but may attempt to do before trial) research specific the benefits of Gralise, even though he already has opined that Gralise offers no benefit over immediate release gabapentin. The research Dr. Sinatra did not do before preparing his report includes research into Gralise (because he "just didn't at the time") and literature discussing any advantages of an extended release formulation of gabapentin over Neurontin:

> Q.    You didn't look for [below mentioned references] before you filed your report?

[Objection omitted]

A.     No, sir.

Q.     Is there any particular reason why?

A.     I just didn't at the time. Now that I have read more about the claims of the drug, Dr. Brown's opinion of the drug that it would offer some special advantages in her patient population, ***I want to just make sure that it is truly represented in the literature, that there is some documentation rather than just anecdotal reports***.

(Ex. 10 at 50:2-15 (emphasis added.))

The "below mentioned references" from the quote above include references undoubtedly are highly relevant to his opinion and are among the types of references Dr. Sinatra should have consulted before arriving at his firm conclusion.

Those references include references to:

- Determine whether there are "any advantages that an extended gastric retained dosage can offer patients" (*id*. at 47:20-48:4);

- Determine a "pharmacoeconomic analysis" to see whether there is any benefit for an extended release gabapentin formulation (*id*.); and

- Determine whether "long-term data [] suggest that patients on gastric retained dose[s] do better than current therapy, which is either entry level gabapentin or … pregabalin." (*Id*.)

What's more, Dr. Sinatra admitted that the sources he would consult to do this research included sources published before he submitted his report which were available to him before he prepared his report, including publications from up to "several years ago." (*Id.* at 49:6-50:6.)

In sum, Dr. Sinatra disagreed with Dr. Brown without actually doing the research sufficient to disagree, and failed to do that research for no justifiable reason. Dr. Sinatra did additional research after he prepared his report and before his deposition, and apparently still feels he needs to do more research to fully grasp Dr. Brown's opinion. (*Id.* at 60:14-61:8.) And, as noted, Dr. Sinatra neither has experience with Gralise nor sought the opinions of doctors who do have experience with Gralise before he prepared his report, which means he lacked the background necessary to make these statements without doing that research.

This flaw provides an additional reason for the Court to exclude Dr. Sinatra's testimony on reliability grounds. Dr. Sinatra certainly would not be able to publish a paper disagreeing with another physician's opinions as to the effectiveness of Gralise compared to Neurontin without first researching those opinions and doing other fundamental research that Dr. Sinatra admittedly failed to do here.[8] *See Kumho Tire*, 526 U.S. at 152; *Sheehan*, 104 F.3d at 942; *Paoli*, 35

---

[8] An analogous circumstance is where a doctor renders an expert opinion about a patient's condition but has not examined the patient. Courts exclude these opinions for lack of foundation and unreliability. *E.g.*, *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123-24 (5th Cir. 1988), *cited in Fabrizi v. Rexall Sundown, Inc.*, C.A. No. 01-289, 2004 WL 1202984, at *11-12 (W.D. Pa. June 2, 2004) (excluding expert report of doctor who did not examine patient); *cf. Braun v. Lorillard Inc.*, 84 F.3d 230, 2235 (7th Cir. 1996) ("[*Daubert* discourages the hiring of reputable scientists … to testify for a fee to propositions that they have not arrived at through the methods … they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit."), *cert. denied* 519 U.S. 992 (1996).

F.3d at 742; *Claar*, 29 F.3d at 502-03. The Court should hold Dr. Sinatra to that same standard and exclude his unreliable testimony.

## 2. Dr. Sinatra's Opinion Does Not Fit the Facts of this Case

The "fit" element of the "qualifications, reliability, and fit" triad requires that "good grounds[] extend[] to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Paoli*, 35 F.3d at 743. Of course, conclusions supported only by *ipse dixit* are not supported by good grounds. "[A]n impressive resume is not a guarantor of relevancy. The expert's opinion must 'fit' the case, and his *ipse dixit* that it does is never enough." *Davis v. Duran*, 277 F.R.D. 362, 368 (N.D. Ill. 2011) (citing *Joiner*, 522 U.S. at 146); *see also Daubert II*, 43 F.3d at 1319 (stating that an experts qualifications, conclusions, and assurances of reliability are "not enough" to satisfy *Daubert*).

For all the reasons explained above in connection with the "rigor" requirement, Dr. Sinatra's opinions as to no long felt need also fail the "fit" requirement. There simply is too great an analytical gap between Dr. Sinatra's unsupported statements that do not embody the rigors of his field and his conclusion that no long felt need existed in 2001/2002 for the Court to determine that Dr. Sintara's opinion is reliable. *See Joiner*, 522 U.S. at 146 *Daubert II*, 43

F.3d at 1319; Fed. R. Evid. 702(a) (expert's testimony must fit such that it helps the trier of fact).

### 3. Dr. Sinatra's Testimony Should Be Excluded Because It Will Waste The Court's Time

Court should exclude Dr. Sinatra's testimony for this additional reason that the presentation of inadmissible testimony is a waste of the Court's time. *See* Fed. R. Evid. 403; *Paoli*, 35 F.3d at 746; *Unisys Savings*, 173 F.3d at 145.

### B. DR. SINATRA'S OPINIONS THAT DRUGS NOT AVAILABLE IN 2001 SATISFIED A LONG FELT NEED DO NOT FIT THE FACTS OF THE CASE

Aside from his unfounded opinions that an extended release gabapentin did not meet a long felt but previously unmet need, Dr. Sinatra also opines that other drugs not available as of the earliest effective filing date of the patents-in-suit could have met that need. Specifically, Dr. Sinatra devotes an entire section of his report to the opinion that pregabalin "provides advantages over Neurontin and generic gabapentin that addresses the alleged needs identified by Dr. Brown." (Ex. 14 ¶¶ 21, 33-36.)  Dr. Sinatra also testifies that other drugs, such as tapentadol or Cymbalta, are also alternatives that could have addressed the needs identified by Dr. Brown. (*Id.*)

The problem with these opinions of Dr. Sinatra is that – as he recognizes - none of these drugs were available as of the invention dates of any of the patents-in-suit (here, the earliest effective filing dates of 2001-2001) (Ex. 10 at 80:11-

84:12), which is when the Court must assess whether a long-felt need has been resolved. *E.g.*, *Procter & Gamble Co. v. Teva Pharms.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

In fact, in *Procter & Gamble*, the Federal Circuit flatly rejected the same contention Dr. Sinatra makes with respect to Lyrica, Cymbalta, and Tapentadol in this case. In *Procter & Gamble* the defendant argued that a competing drug met the alleged long-felt need where the plaintiff did not make the competing drug and the competing drug hit the market after the invention date of plaintiff's patents-in-suit but before the commercial embodiment of the patents-in-suit. 566 F.3d at 998. The Federal Circuit reiterated that courts must assess at the time of invention whether asserted claims resolved a long felt need, even where a competing drug beats the commercial embodiment to market. *Id.*

Because competing drugs introduced after the invention dates of the asserted claims of Depomed's patents-in-suit are improper rebuttal evidence of long felt but unmet need as a matter of law, his opinions are irrelevant and unhelpful to this case, and therefore simply do not fit. *See* Fed. R. Evid. 702; *Paoli*, 35 F.3d at 743; *Schneider*, 320 F.3d at 404. Indeed, this opinion fails to satisfy even the general relevancy standard, and it would waste the Court's time to take testimony thereon. *See* Fed. R. Evid. 401, 403.

## VI.   CONCLUSION

For the foregoing reasons, Depomed respectfully requests the Court grant

the exclusionary relief requested in Depomed's Motion *In Limine* Nos. 3 through

5.

Dated:  April 22, 2014                              Respectfully submitted,

                                                    By: /s/        *Leda Dunn Wettre*
                                                          Leda Dunn Wettre
                                                          ROBINSON, WETTRE & MILLER LLC
                                                          One Newark Center, 19th Floor
                                                          Newark, New Jersey 07102
                                                          Telephone: (973) 690-5400
                                                          Facsimile: (973) 466-2760
                                                          Email:  lwettre@rwmlegal.com

                                                          *Attorneys for Plaintiff Depomed, Inc.*